UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| ANGELA DAVIS, on behalf of the estate of<br>CRYSTAL PRICE and minor D.H.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>ROANE COUNTY, TENNESSEE, and<br>SOUTHERN HEALTH PARTNERS, INC.,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.:  3:12-CV-634-TAV-CCS |
| | )<br>) | *Consolidated with* |
| J.V., a minor, individually and on behalf of<br>CRYSTAL MARLENA PRICE, deceased,<br>as Child and next of kin, by<br>JESUS VARGAS, Parent and sole guardian,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>ROANE COUNTY, ROANE COUNTY<br>SHERIFF'S OFFICE; SHERIFF JACK<br>STOCKTON, in his official capacity; and<br>SOUTHERN HEALTH PARTNERS, INC.,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.:  3:12-CV-673-TAV-CCS |

## MEMORANDUM OPINION AND ORDER

This consolidated civil action is before the Court on two motions for summary

judgment filed by defendants Roane County, Tennessee [Doc. 148] and Southern Health

Partners, Inc. ("Southern Health") [Doc. 150].  Plaintiffs responded in opposition [Docs.

177, 178, 179],[1] and defendants replied [Docs. 193, 194, 195]. For the reasons that follow, the Court will grant Roane County's motion and grant in part and deny in part Southern Health's motion.

## I.     Background and Statement of Facts[2]

### A.     Roane County's Relationship with Southern Health Partners, Inc.

Roane County contracted with Southern Health to provide medical services to inmates [Doc. 148-7; Doc. 150-2 p. 3; Doc. 177 ¶ 1]. One of the terms of the contract was to have a nurse at the jail every day, including weekends and holidays [Doc. 148-8; Doc. 148-26]. Typically, a nurse was at the jail during normal business hours [Doc. 148-8; Doc. 177 ¶ 7]. If a nurse was not present, Nurse Regina Lester, the Medical Team Administrator, could be called on the phone [Doc. 148-26; Doc. 177 ¶ 6]. Nurse Lester managed the medical department of the jail [Doc. 177 ¶ 6]. Nurse Lester reported to Von Simpson, RN [*Id.* ¶ 8]. He visited the jail once or twice each month [*Id.*]. Another nurse,

---

[1] Plaintiffs move the Court to accept their late-filed response to the motions for summary judgment [Doc. 180]. Pursuant to its authority under Rule 6(b) of the Federal Rules of Civil Procedure, the Court hereby **GRANTS** the motion.

[2] In Southern Health's response to plaintiffs' statement of additional material facts, it moves to strike plaintiffs' statement of additional facts [Doc. 194]. Southern Health asserts that the statement "improperly contains both unsupported 'facts' and the legal arguments of counsel in violation of L.R. 56.01(c)" [*Id.* at 1]. There is no local rule 56.01(c), and it appears that Southern Health is attempting to rely upon Tennessee state law in support of its motion to strike. Because federal procedural rules govern this action, the motion is **DENIED**. Roane County also moves the Court not to consider the statement of additional material facts because it "is mostly the argument of counsel and Plaintiffs' experts, not facts as contemplated by Federal Rule of 56(c)" [Doc. 195 at 1]. The Court **DENIES** Roane County's motion as well. The Court will consider plaintiffs' statement of additional material facts within the parameters set forth by Rule 56 of the Federal Rules of Civil Procedure.

Lori Wright, worked on weekends and filled in for Nurse Lester [*Id.* ¶ 7]. Southern Health also had a physician who provided medical care to the inmates on a periodic basis [Doc. 148-7; Doc. 148-26]. According to Officer Allison Williams, the physician visited the jail at least once a month and stayed for as long as needed [Doc. 148-16]. Plaintiffs assert the physician was rarely at the jail and did not directly supervise the nurses [Doc. 178 p. 3].

Southern Health has implemented a Policy and Procedure Manual for Health Services in Jails [Doc. 150-2 p. 3]. The manual was created to ensure uniformity and consistency in day-to-day operations of medical services and to track the guidelines for accreditation by the National Commission of Correctional Healthcare ("NCCHC")— which Jennifer L. Hairsine, President and Chief Executive Officer of Southern Health asserts is the gold standard in correctional healthcare—as well as the American Correctional Association [*Id.*]. The manual is a "live" document that is periodically edited and updated [*Id.* at 4–5]. Each staff member is expected to be familiar with and utilize the policies and procedures, unless sound medical judgment dictates a deviation [*Id.* at 5]. The manual must be kept in the medical unit of each facility with which Southern Health contracts [*Id.*].

Plaintiffs dispute that the manual tracks the standards issued by the NCCHC [Doc. 178 p. 2]. As an example, plaintiffs point out that the NCCHC guidelines provide that the jail medical provider must oversee and cooperate with the jail administrator to ensure that all correctional officers who work with inmates receive health-related training, but

3

the policy provides that the jail administrator must conduct this training [*Id.*]. As another example, plaintiffs state the NCCHC guidelines contemplate that nurses perform only under the direct supervision of a licensed physician or licensed qualified clinician, but the policy removes the supervision component [*Id.* at 3].

As for training, Southern Health trains its nurses upon employment and then monthly online [Doc. 177-3 pp. 9, 17]. It also conducts periodic performance evaluations for nurses [*Id.* at 5].

### B.    Crystal Price's Incarceration

On December 7, 2011, Crystal Price was incarcerated at the Knox County Jail for criminal convictions related to criminal impersonation and possession of drug paraphernalia [Doc. 148-2]. At the time of her arrest, Ms. Price possessed a spoon with a partially cooked pill along with a syringe [*Id.*]. Yet, when she was booked into the Knox County Jail, she signed that she had no substance abuse, mental health, or medical problems [Doc. 148-3]. On December 10, 2011, due to her failure to pay child support, Ms. Price was transported to the Roane County Jail [Docs. 148-4, 148-5].

When she was booked into the Roane County Jail, a correction officer completed a medical questionnaire form using answers provided by Ms. Price [Doc. 148-6; Doc. 148-7 p. 5]. Ms. Price's form indicates that she noted a history of blood disorder that causes heart attacks, seizures "when inclosed [sic] in a small area," drug addiction to "roxys" and "hydros," and an allergy to penicillin" [Doc. 148-6]. The form also notes that Ms. Price's gallbladder was removed three months earlier [*Id.*]. In addition, when asked if

4

she was "suffering from any illness with fever, respiratory symptoms, cough, runny nose, body pains, nausea, vomiting or diarrhea," the form indicates Ms. Price responded that she was coughing [*Id.*]. The officer observed that Ms. Price was "alert and stable" [*Id.*]. This form was placed in Ms. Price's file and was sent for a nurse to review [Doc. 148-7 p. 5; Doc. 148-8 pp. 10–11]. The nurse checks the forms on a daily basis [Doc. 148-7 p. 5].

On December 12, 2011, Ms. Price filled out a sick call slip, in which she complained of coughing and that she could not sleep [Doc. 148-10]. Nurse Lester received the slip no later than December 13, 2011, and examined Ms. Price on December 14, 2011 [*Id.*]. As part of the protocols/standing orders of Southern Health, Nurse Lester performed a Clinical Pathway regarding Ms. Price's upper respiratory symptoms [Doc. 148-11]. Nurse Lester took Ms. Price's symptoms and her clinical data and vitals, and she executed a treatment plan pursuant to the protocols [*Id.*]. Specifically, Nurse Lester noted that Ms. Price's blood pressure was 101/74, she had a pulse of 131, she had respirations of 20, and she had a temperature of 99.8; that Ms. Price's skin was warm, dry, and pale; and that Ms. Price had labored breathing [Doc. 177 ¶ 54]. That same day, Dr. Khairollahi prescribed the antibiotic Erythromycin for seven days, Tylenol for five days, and the vitamin CTM for five days [Doc. 148-12; Doc. 148-13]. Nurse Lester also noted that a daily detox monitor was started [Doc. 177 ¶ 53].[3]

---

[3] Plaintiff notes that there is no evidence that any detox monitoring was actually performed [Doc. 177 ¶ 53].

Also on December 14, Ms. Price appeared in Child Support Court and pleaded guilty to not paying child support [Doc. 148-14]. She was ordered to remain in jail until she paid $800 [*Id.*].

On December 16, 2011, female inmates in the Alpha Pod complained to Officer Carissa Bryd that they had issues with Ms. Price wiping her feces on the wall and toilet, leaving the shower naked, and stealing toothpaste [Doc. 148-15]. As a result, Officer Bryd and Officer Williams placed Ms. Price in isolation for the safety of Ms. Price and for behavioral control of the pod, which occurred around 11:36 a.m. that day [*Id.*; Doc. 148-9].

Also on December 16, 2011, at 11:50 a.m., Ms. Price complained of coughing up blood [Doc. 148-17]. Nurse Lester examined Ms. Price and, pursuant to standing orders, ordered a chest x-ray [*Id.*; Doc. 148-12]. Nurse Lester noted that Ms. Price's oxygen saturation was 93% on room air, her blood pressure was 97/66, her pulse was 107, her respirations were 16, and her temperature was 97.4 [Doc. 177 ¶ 56]. The chest x-ray was performed the same day [Doc. 148-18]. The final report indicated that there was "[n]o radiographic evidence of acute cardiopulmonary disease" [*Id.*].[4]

On December 18, 2011, at 11:56 a.m., Ms. Price stated to the jail's control tower: "if yall don't send me to Lakeshore, your gonna come in here and find me dead" [Doc. 148-19]. Ms. Price was placed in the restraint chair in the intake area as a result of this statement [*Id.*; Doc. 148-9; Doc. 148-8 p. 5]. At 12:08 p.m., the jail contacted the Mobile

---

[4] Nurse Lester received the chest x-ray report on December 19, 2011 [Doc. 148-17].

Crisis Unit about the suicide threat [Doc. 148-20]. At 3:26 p.m., the Mobile Crisis Unit arrived at the jail to examine Ms. Price [*Id.*].

The call to the Mobile Crisis Unit was made pursuant to the policy of the jail [Doc. 148-7 p. 9]. The Mobile Crisis Unit is a mental health agency that evaluates inmates [*Id.*]. George Burr, a mental health professional with Ridgeview Behavioral Health Services, examined Ms. Price for about two hours [Doc. 148-21]. Mr. Burr recommended that Ms. Price be placed on suicide precaution for twenty-four hours [*Id.*]. Ms. Price showered and then was moved to a holding cell within the intake area for suicide observation [Doc. 148-9; Doc. 148-20].

On December 20, 2011, Angela Davis, Ms. Price's mother, visited Ms. Price [Doc. 148-22]. According to Ms. Davis, Ms. Price reported that she did not feel well, but Ms. Davis did not talk to anybody about Ms. Price after the visit [Doc. 148-23 pp. 3–4].

On December 21, 2011, Ms. Price was moved back to the general population area of the Alpha Pod [Doc. 148-9].

On December 22, 2011, Ms. Price had her fourteen-day physical examination with Nurse Lester [Doc. 148-9; Doc. 148-25]. This fourteen-day examination is performed for every inmate [Doc. 148-26 p. 61]. The doctor signed off on Ms. Price's examination on January 6, 2012 [*Id.*].

On December 23, 2011, at 11:00 a.m., Officer Lisa Ewing noticed that Ms. Price was wearing only her uniform top [Doc. 148-27]. Officer Ewing's incident report indicates that other female inmates were agitated because Ms. Price had defecated on the

7

floor and toilet in the upper tier bathroom, and had done so in the previous days as well [*Id.*]. Ms. Price was showered and her dirty laundry was collected [*Id.*]. She was placed in isolation "until she learned to respect the share[d] spaces" [*Id.*].

On December 25, 2011, Ms. Price left the isolation cell on the second floor of the Alpha Pod and proceeded to go down the steps [Doc. 148-29]. She received a tray of food, and as she turned to go back up the steps, she fell backward and sat down on the steps [*Id.*].[5] Two officers came to her assistance [*Id.*].

Officer Justin Joseph received a call that an inmate had fallen and responded with an oximeter machine, a blood pressure cuff, and a wheelchair [*Id.*; Doc. 148-30 p. 3]. According to the incident report, Officer Joseph reported that Ms. Price appeared pale and "displayed the appearance of short hindered breathing cycles" that would "calm when vitals were being checked" [Doc. 148-31]. Officer Joseph also reported that Ms. Price said she would not feel better until taken to the hospital and that she had not eaten in sixteen days or slept in three days, although there was no report of her refusing meals and Officer Wanda McKinney had logged her sleeping [*Id.*].

The nurse was not yet at the jail, so Officer Joseph called Nurse Lester at 5:15 a.m. [Doc. 148-30 pp. 4–5; Doc. 148-31]. Nurse Lester advised Officer Joseph to keep Ms. Price in a holding cell for medical observation and to have the dayshift nurse see Ms. Price when she arrived [*Id.*; Doc. 148-32].

---

[5] Roane County asserts that the video shows no fall [Doc. 149 p. 8]. Construing the evidence in plaintiffs' favor, however, the video shows that Ms. Price did fall backward.

At 5:51 a.m., Ms. Price moved into Holding Cell 1 [Doc. 148-9]. Holding Cell 1 is in the intake area and is approximately ten feet from a raised desk that is occupied by correction officers twenty-four hours each day [Doc. 148-7 p. 10; Doc. 148-33].

Later that morning, around 8:00 a.m., the dayshift nurse, Lori Wright, arrived at the jail and examined Ms. Price [Doc. 148-32; Doc. 148-34]. Nurse Wright contacted Nurse Lester, and Nurse Lester advised Nurse Wright to start another round of antibiotic and keep Ms. Price in the holding cell for medical observation [Doc. 148-32; Doc. 148-8 p. 5; Doc. 148-36]. Officers checked on Ms. Price every hour [Doc. 148-37].

On December 26, 2011, officers continued to check on Ms. Price every hour and gave Ms. Price her medication [Doc. 148-37; Doc. 148-38]. On December 27, 2011, officers continued their observations [Doc. 148-37; Doc. 148-33]. The officers gave Ms. Price her food and her medication [*Id.*]. On December 28, 2011, the officers checked on Ms. Price throughout the day [*Id.*]. That day, Ms. Price moved from Holding Cell 1 to Holding Cell 4 [*Id.*]. She received her medication and was offered food, which she declined [*Id.*; Doc. 148-39]. She also received a shower [Doc. 148-39]. Officer Brooke Barger noticed that Ms. Price was having trouble breathing, and she called the nurse to discuss [Doc. 148-40]. The nurse informed the officer that Ms. Price was putting on a show [*Id.*]. On December 29, 2011, the officers continued their observations [Doc. 148-39]. Ms. Price received food and medication [*Id.*]. Ms. Price did not consume her dinner [Doc. 148-41].

On December 30, 2011, officers observed Ms. Price throughout the early morning hours [Doc. 148-37].  Ms. Price refused food at 5:42 a.m. [*Id.*].  Shortly before shift change at 7:00 a.m., at 6:48 a.m., Officer Malvery Cooper observed that Ms. Price had urinated on herself and did not have any bottom clothing on [Doc. 148-33; Doc. 148-41; Doc. 148-42; Doc. 148-43].  Officer Cooper went on to finish her paperwork [Doc. 177 p. 19].  At 7:10 a.m., Officers McKinney and Michael Murphy attempted to give medication to Ms. Price, but she refused [Doc. 148-33; Doc. 148-42; Doc. 148-37].

Officer Cooper advised Officer Williams about Ms. Price's situation and Officer Williams said she would take care of it [Doc. 148-44].  Officer Williams did not consider the situation an emergency, so she went on to address her other duties [Doc. 148-16].  Officer Williams observed Ms. Price in her cell at 7:37 a.m. [Doc. 148-44; Doc. 148-33].  She did not see anything out of the ordinary at that time [Doc. 148-44; Doc. 148-16].

At 8:06 a.m., Officer Williams again checked on Ms. Price [Doc. 148-33].  Officer Williams noticed that Ms. Price looked very pale [Doc. 148-44].  She opened the door and did not receive a response from Ms. Price [*Id.*].  She began a sternum rub with her right knuckles and left hand, and she checked for a pulse on Ms. Price's right wrist [*Id.*].  Ms. Price did not respond, so Officer Williams called for Officer Carissa Byrd via radio to come to intake immediately because Ms. Price was not responding [*Id.*].  Around 8:06 a.m., Officer Byrd and Officer Murphy entered Ms. Price's holding cell and Officer Williams informed them of the situation [*Id.*].  Officer Byrd immediately began chest compressions and CPR [Doc. 148-33; Doc. 148-44; Doc. 148-45].  Officer Williams

called 911 on her radio, and EMS was dispatched to the jail [Doc. 148-33; Doc. 148-44; Doc. 148-45; Doc. 148-46].   At around 8:08 a.m., Officer Murphy entered the holding cell with an AED device [Doc. 148-33; Doc. 148-44; Doc. 148-45; Doc. 148-47].   Officer Murphy placed the AED pads on Ms. Price; the AED advised "no shock" and to continue CPR [Doc. 148-33; Doc. 148-44; Doc. 148-45; Doc. 148-47].   Officer Byrd continued CPR [Doc. 148-33 Doc. 148-44; Doc. 148-45; Doc. 148-47].   Again the AED advised "no shock" and to continue CPR [Doc. 148-44; Doc. 148-45; Doc. 148-47].

At 8:11:06 a.m., EMS Director Howie Rose entered the intake area [Doc. 148-33; Doc. 148-44].   Other EMS personnel and Nurse Lester also arrived, and they took over the CPR [Doc. 148-33; Doc. 148-44; Doc. 148-48].   They continued CPR through 8:36:55 a.m. [*Id.*].   Mr. Price was then placed on a stretcher and CPR continued [*Id.*].  Ms. Price was taken to the Roane County Medical Center Emergency Room [Doc. 148-33; Doc. 148-46].

Ms. Price was pronounced dead at the Roane County Medical Center Emergency Room [Doc. 148-49].  The Autopsy Report prepared by Dr. Christopher Lochmuller from the University Pathology Group states that Ms. Price died from staphahylococcus aureus bilateral nercotizing bronchopneumonia, hypertensive cardiovascular disease, and obesity [*Id.*].

### C.    Roane County Training

Roane County correction officers receive forty hours of basic jail training within the first year of their hire date [Doc. 148-16 p. 3].   They also receive CPR and first aid

11

training, although plaintiffs highlight that not all officers are aware of what the vital signs mean [*Id.*; Doc. 177 ¶¶ 41, 42]. In addition, the officers receive on-the-floor training with a supervisor [*Id.*]. Each officer receives the Roane County Jail Policies and Procedures Manual, which he or she might sign that they have read [*Id.* at 3–4].

### D. Procedural History

Plaintiffs' amended complaint [Doc. 104] asserts various causes of action against defendants Roane County and Southern Health. Plaintiffs assert a § 1983 claim against Roane County and Southern Health, claiming Ms. Price's right to medical care as secured by the Eighth and Fourteenth Amendments to the United States Constitution was violated. Plaintiffs also assert a § 1983 claim against Roane County, asserting excessive use of force. In addition, plaintiffs raise various state-law claims, including negligence, wrongful death, and infliction of emotional distress.

Defendants have moved for summary judgment on all claims. Plaintiffs do not oppose dismissal of the excessive force claim and the state-law claims [*See* Doc. 179]. Thus, those claims will be dismissed, and the Court must address only the remaining § 1983 claims.

The parties filed various *Daubert* motions, which were referred to and resolved by the magistrate judge [*See* Doc. 209]. The parties filed objections to the order of the magistrate judge [Docs. 210, 211]. The Court will address those objections in an order filed contemporaneously with this memorandum opinion and order.

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). The plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[M]ere conclusory and unsupported allegations, rooted in speculation, do not meet that burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (quotations and citation omitted). Summary judgment may not be defeated "based on rumors, conclusory allegations, or subjective beliefs." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the

13

record upon which a reasonable finder of fact could find in its favor. *Anderson*, 477 U.S. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Hein*, 232 F.3d at 488.

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III. Roane County

A municipality may not be held liable under 42 U.S.C. § 1983 "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* Accordingly, to succeed on a municipal liability claim under § 1983, a plaintiff "must demonstrate that the alleged federal violation occurred because of a

14

municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 694). Put another way, for Roane County to be liable, plaintiffs must prove that a constitutional violation occurred and that the county is responsible for it. *Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (citation omitted).

## A.      Constitutional Violation[6]

"The failure to address a serious medical need rises to the level of a constitutional violation where both objective and subjective requirements are met." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). To satisfy the objective requirement, "the failure to protect from risk of harm must be objectively 'sufficiently serious,'" meaning the plaintiff must demonstrate "the existence of a 'sufficiently serious medical need.'" *Id.* (citations omitted). To satisfy the subjective requirement, the plaintiff must demonstrate "a sufficiently culpable state of mind in delaying medical care." *Id.* (citation omitted). This component requires the plaintiff to show "that prison officials acted with 'deliberate indifference' to a serious medical need." *Id.* "An official is deliberately indifferent where 'the official knowns of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that

---

[6] It is unclear whether Ms. Price was a pretrial detainee or a convicted prisoner while in custody at the Roane County Jail. It is well established that "deliberate indifference to the serious medical needs of prisoners" constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). While the Eighth Amendment does not apply to pretrial detainees, the Fourteenth Amendment affords pretrial detainees a due process right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Thus, for purposes of this memorandum opinion and order, the analysis is the same regardless of whether Ms. Price was a pretrial detainee or a convicted prisoner.

15

a substantial risk of harm exists, and he must also draw the inference." *Id.* (citation omitted).

While Roane County disputes that Ms. Price has a sufficiently serious medical need, the record includes evidence suggesting otherwise. "A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment." *Burgess*, 735 F.3d at 476. When she entered the Roane County Jail, Ms. Price stated she had a blood disorder that causes heart attacks and a drug addiction. In addition, Ms. Price exhibited upper respiratory symptoms.

Turning to the subjective prong, Roane County asserts that no Roane County official was deliberately indifferent to Ms. Price's serious medical needs because they did not intentionally deny or delay access to medical care nor intentionally interfere with treatment once prescribed. Viewing the evidence in the light most favorable to plaintiffs, the Court does not find any Roane County official was deliberately indifferent to the medical needs of Ms. Price.

Plaintiffs argue that the booking officer was deliberately indifferent when he failed to ensure Ms. Price saw the jail nurse after she listed several positive responses to the medical screening. Yet, the undisputed facts show that the medical intake form was sent to the nurse for review.

Plaintiffs also argue Officer Joseph was deliberately indifferent on December 25 when he took Ms. Price's vital signs. On that day, Officer Joseph responded to the

16

general pod area after Ms. Price had fallen on the stairs. He brought her a wheelchair and took her vitals. He then called Nurse Lester to report what had happened and the vitals he had taken. He followed Nurse Lester's instructions to take Ms. Price to the holding cell in the booking area for observation and to have the nurse on duty that day examine her.

Plaintiffs further argue Officer Barger was deliberately indifferent on December 28 when she noted that Ms. Price was having trouble breathing and did nothing. But the undisputed facts show that Officer Barger did call Nurse Lester to report the breathing problem.

Finally, plaintiffs argue Officer Cooper was deliberately indifferent when she observed Ms. Price's incontinence, but did nothing. But Officer Cooper did respond to the situation. Officer Cooper advised Officer Williams that Ms. Price needed to be attended to, and she asked Officer Williams to do so because the shift was changing.

Accordingly, the Court finds that no Roane County official committed a constitutional violation regarding Ms. Price's right to adequate medical care while she was incarcerated.

### B. Policy or Custom

Even assuming a constitutional violation by a Roane County official, the Court finds that Roane County is entitled to summary judgment because it did not have a policy or custom that caused the violation. Again, in asserting a § 1983 claim, a plaintiff must "identify the policy, connect the policy to the [County] itself and show that the particular

injury was incurred because of the execution of the policy." *Graham*, 358 F.3d at 383 (alteration in original) (citation omitted). According to the Sixth Circuit, a plaintiff can show that a municipality has an illegal policy or custom by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478. Plaintiffs assert the existence of an illegal official policy or custom, as well as a policy of inadequate training.[7]

Plaintiffs assert that Roane County had a policy or custom of passing responsibility for the care of inmates to Southern Health Partners.[8] They claim that Roane County has a non-delegable duty to provide medical care, so it cannot "point the finger" at Southern Health. Citing law from outside the Sixth Circuit, they claim Roane County is liable for any constitutional deprivations caused by the policies or customs of Southern Health. The Court finds this argument unavailing.

The Sixth Circuit has stated that "[n]on-medical staff are entitled to assume that members of the medical staff are performing their duties properly unless they have reason

---

[7] Plaintiffs also allege a failure to supervise and a failure to discipline by Roane County, but plaintiffs do not address these theories in any detail in their response [*see* Doc. 179], and there is nothing in the record that would support such theories of liability. The Court therefore finds them forfeited and does not address them. *Notredan, L.L.C. v. Old Republic Exch. Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013).

[8] Also, in the complaint, plaintiffs assert custom of placing inmates who need medical treatment in isolated holding cells. There is no evidence supporting this policy or custom in the record. The Court therefore does not address it any further.

18

to know otherwise." *Robbins v. Black*, 351 F. App'x 58, 63 (6th Cir. 2009); *see also Graham*, 358 F.3d at 384 ("Nor is it unconstitutional for municipalities and their employees 'to rely on medical judgments made by medical professionals responsible for prisoner care'" (citation omitted)). Here, there is nothing in the record to support that the Roane County officers knew that the Southern Health medical staff were not properly performing their duties. Moreover, the Sixth Circuit has stated that "it is not unconstitutional for municipalities to hire independent medical professionals to provide on-site health care to prisoners in their jails." *Graham*, 358 F.3d at 384. Thus, the fact that Roane County hired Southern Health to provide healthcare to its inmates and relied upon their judgments is not an unconstitutional policy.

To the extent plaintiffs argue that Roane County had a policy of inaction, such policy "must reflect some degree of fault before it may be considered a policy upon which § 1983 liability may be based." *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (internal quotation marks and citation omitted). A plaintiff must demonstrate: "(1) a clear and persistent pattern of mishandled medical emergencies for [those in custody]; (2) notice, or constructive notice of such pattern, to [Roane County]; (3) tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction; and (4) that the custom or policy of inaction was the 'moving force,' or direct causal link, behind the constitutional injury." *Id.* (citation omitted).

Here, there is no evidence that Roane County had a custom of denying medical treatment to those in its custody or a pattern of mishandling medical emergencies.

19

Indeed, the record shows that Roane County officials frequently sought out medical professionals in connection with Ms. Price's incarceration when there was a need for medical care. Nor is there evidence that Roane County had notice of a "clear and persistent pattern" of denying treatment that would demonstrate the existence of a policy of inaction. Even more, the record is lacking proof that demonstrates Roane County was the "moving force" behind Ms. Price's death.

Accordingly, the Court finds that there was no policy or custom regarding medical care provided to inmates that was the moving force behind any constitutional violation related to Ms. Price.

Plaintiffs also argue that Roane County failed to train its officers on how to respond to medical needs and emergencies, training them only with respect to basic first aid and CPR. "'[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). In order to prevail on their failure to train claim, plaintiffs must show that: (1) "[Roane County's] training program was inadequate for the task that officers must perform;" (2) "the inadequacy was the result of [Roane County's] deliberate indifference;" and (3) "the inadequacy was closely related to or actually caused the injury." *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)).

In order to demonstrate deliberate indifference in this context, plaintiffs can show "prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (citations omitted). Plaintiffs make no such showing. There is nothing in the record to suggest that Roane County officials had a history of providing inadequate medical treatment for its inmates.

But a plaintiff can also demonstrate deliberate indifference through a single violation of rights. "For liability to attach in the instance of a single violation, the record must show a complete failure to train the police force, training that is so reckless or grossly negligent that future policy misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (citations omitted). The record shows that Roane County officers were trained with respect to medical care, particularly, CPR and first aid training, and trained with a supervisor. To the extent that any one officer was not satisfactorily trained, that "alone [will not] suffice to fasten liability on the [county], for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390–91 (citations omitted).

Accordingly, the Court finds Roane County is entitled to summary judgment.

## IV.    Southern Health

The Sixth Circuit "has held that private corporations performing traditional state functions, such as the provision of medical services to prison inmates, act under color of state law for purposes of § 1983." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (citation omitted).  Thus, because there is no question that Southern Health was acting under the color of state law, the Court must determine whether Southern Health deprived Ms. Price a right secured by the Constitution or laws of the United States.

### A.    Constitutional Violation

To prevail on their § 1983 claim against Southern Health, plaintiffs must prove that Southern Health acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Again, the claim has objective and subjective components.  The objective component requires proof of "a sufficiently serious medical need." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (internal quotation marks omitted).  The subjective component requires proof "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* (internal quotation marks omitted).

The Court has already determined that the objective component is met with respect to Ms. Price.  Turning to the subjective component, the Court notes that "a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citations

22

omitted). "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id.* "On the other hand, a plaintiff need not show that the official acted for the very purpose of causing harm or with knowledge that harm will result." *Id.* (internal quotation marks and citation omitted). "Instead, deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* (internal quotation marks and citation omitted).

Southern Health argues that plaintiffs' claim is nothing more than a medical malpractice claim. In support, it points to its arguments concerning plaintiffs' experts, who Southern Health claim are not qualified to offer testimony regarding the standard of care at the Roane County Jail and who merely say that the Southern Health employees breached the standard of care in their treatment of Ms. Price. In an order that will be entered contemporaneously with this memorandum and order, the Court finds Southern Health's arguments regarding plaintiffs' experts unavailing and elects not to discuss them here. Thus, the remaining question is whether plaintiffs have put forth proof to raise a genuine issue of material fact regarding whether a Southern Health employee subjectively perceived and disregarded a substantial risk to Ms. Price.

The Court finds plaintiffs have put forth evidence that raises a genuine issue of material fact regarding whether Nurse Lester perceived and disregarded a substantial risk of harm to Ms. Price. For example, Ms. Price complained of withdrawal symptoms and

23

Nurse Lester ordered a daily detox monitor, but no detox monitoring was ever performed. Also, Nurse Lester ordered medical observation, but there is no record of any medical observation being performed. Finally, on December 25, the record indicates that upon being informed that Ms. Price was having trouble breathing after her fall in the general population pod, Nurse Lester said that Ms. Price was putting on a show.

Accordingly, while there is evidence that Nurse Lester did respond to Ms. Price's medical needs in part, there is also evidence in the record from which a jury could find that Nurse Lester was deliberately indifferent to the medical needs of Ms. Price.

### B. Policy or Custom

In asserting a § 1983 claim on the basis of a policy or custom, as plaintiffs do here with respect to Southern Health, plaintiffs must "identify the policy, connect the policy to [Southern Health] itself and show that the particular injury was incurred because of the execution of the policy." *Graham*, 358 F.3d at 383 (alteration in original) (citation omitted). As already noted, a plaintiff can show that state actor has an illegal policy or custom by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478. With respect to Southern Health, plaintiffs allege in the complaint a policy of denying inmates medical attention, a policy of failing to act on reports and complaints, a policy of failing to require on-site personnel evaluations of

inmates, and inadequate training and supervision. In their response to the motions for summary judgment, however, plaintiffs focus on the treatment protocols used by Southern Health staff, and they argue that these treatment protocols were used in lieu of having a doctor examine the inmates. The Court thus limits its discussion to this custom, finding other theories forfeited. *Notredan, L.L.C. v. Old Republic Exch. Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013).

Southern Health argues that its Policy and Procedure Manual is based on the NCCHC standards, which is the gold standard regarding the delivery of medical care in correctional settings; thus, it asserts, the policies are constitutional on their face. Southern Health, however, fails to provide any authority for this proposition of constitutionality, and the Court declines to find that they are constitutional on their face. Even so, plaintiffs have identified ways in which the Southern Health's manual deviates from the NCCHC standards.

Southern Health also argues that the protocols are not a policy or procedure of Southern Health because the Policy and Procedure Manual requires that the nursing staff use the protocols that are appropriate to the level and skill of the nursing personnel carrying them out and comply with relevant state practice acts, that the treatment of each patient's condition be individualized, and that the physician may provide his own treatment protocols for common conditions and must sign them as verification that he has reviewed them. It further argues that the protocols are in place to allow the nursing personnel to promptly begin treatment of common, non-emergent conditions, but their

use is not required.  Yet, the existence of a custom can serve as the basis for liability, and plaintiffs assert that these protocols were customarily used by the nurses at the Roane County Jail, without physician involvement, to render care for inmates, including care outside the scope of the nurses' licensure.  And plaintiffs have put forth the testimony of Dr. McCormack, who opines that the treatment protocols were insufficient to provide medical care, particularly to Ms. Price, and that following the protocols caused Ms. Price's death.  They also point out that Nurse Lester testified that she used the protocol for "upper respiratory infection," but no protocol for "upper respiratory infection" existed.  Accordingly, the Court finds there is a question of fact as to whether Southern Health had a custom of using treatment protocols without physician involvement and beyond the scope of the nurses' licensure and whether following such protocols caused Ms. Price's death.

As noted above, in order to prevail on their failure to train claim,[9] plaintiffs must show that: (1) "[Southern Health's] training program was inadequate for the task that [its personnel] must perform;" (2) "the inadequacy was the result of [Southern Health's] deliberate indifference;" and (3) "the inadequacy was closely related to or actually caused the injury." *Ciminillo*, 434 F.3d at 469 (citation omitted)).  These are the same standards

---

[9] To the extent plaintiffs argue that Southern Health had a policy of not training the correctional officers of the Roane County Jail, the Court finds the argument without merit.  As discussed earlier, the Court finds that the Roane County officers were trained on how to respond to medical needs and emergencies.  It also finds that Roane County did not have an unconstitutional policy in utilizing Southern Health personnel when a medical situation arose.

for a failure to supervise claim. *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012).

Southern Health has presented proof that it trains its nurses upon employment and then monthly online. It also conducts periodic performance evaluations. Plaintiffs have failed to put forth any evidence rebutting this training or any argument that this training was inadequate for the provision of medical care to inmates at the Roane County Jail.

Even if the training program or supervision was inadequate, plaintiffs have failed to raise a genuine issue of material fact regarding deliberate indifference. There are two ways to demonstrate deliberate indifference. Plaintiffs can show "prior instances of unconstitutional conduct demonstrating that [Southern Health] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher*, 398 F.3d at 849 (citations omitted). But plaintiffs make no such showing. Plaintiffs can also demonstrate deliberate indifference through a single violation of rights. But "[f]or liability to attach in the instance of a single violation, the record must show a complete failure to train . . . , training that is so reckless or grossly negligent that future policy misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey*, 453 F. App'x at 567 (citations omitted). Likewise, plaintiffs have not put forth any evidence to make such a showing.

For these reasons, the Court will dismiss the failure to train and supervise claims against Southern Health.

**V.      Conclusion**

For the reasons set forth herein, the Court will **GRANT** plaintiffs' motion to file a late response [Doc. 180], **GRANT** the Motion for Summary Judgment of Defendant Roane County, Tennessee [Doc. 148] and **GRANT IN PART AND DENY IN PART** [Doc. 150].  All claims relating to excessive force and all state-law claims are hereby **DISMISSED**.  This matter will proceed to trial against Southern Health Partners, Inc. on February 16, 2016, at 9:00 a.m.

IT IS SO ORDERED.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE